24-1340. And we have Attorney Dudley starting off, and I understand you would like to reserve three minutes for rebuttals. I would, Your Honor. We're ready when you are. May it please the Court, initially I would note that a week ago today, the State Department issued a directive indicating that it had authorized the extradition and the surrender of my client, Dr. Kenayama, to the Japanese authorities. That is the first time in seven years of this process that now the judiciary is the only decider here in terms of So there's a surrender warrant in place, and I think the government had represented that they were not going to make any moves to actually effectuate the surrender until this case came before the Court. That is correct. There's no immediate urgency on this, but I did want to point that out. Now let's get to know where we stand. I would focus in this argument on the issue of dual criminality. I'm more than willing and able to discuss probable cause as well. But given the time limitation that we have here, I thought I would focus on the dual criminality issue. As we pointed out in our reply brief, this case, if it had involved the dabbing or spraying of vegetable oil on a human being as opposed to a structure, and we looked at it in terms of New York law here, could never have been prosecuted. What does it matter about a person? The question is whether the actions that your client is alleged to have taken, is charged with taking, could give rise to basically, let's call it a felony, a crime punishable by a year of war in either country, not whether different conduct could have been. So why are we asking about whether his conduct, had it been different, could have... It's an analogy, Your Honor, and the government has not cited in any of its briefing over the course of this time, any case in which somebody in the state of New York has been prosecuted for a felony, for applying... No, no, no. That's not the question whether it's ever happened. It's punishable, right? Not has been punished, will be punished, is likely to be punished. Isn't the language of the treaty punishable? That is the language of the treaty. So why would you ask is likely to be punished or unlikely to be punished? The question is, is it punishable? Well, because there has been a series of cases, including cases such as Spatola and Shapiro from this court, the old case of Factor from the U.S. Supreme Court, where the courts have indicated that the dual criminality analysis should be a practical approach. Right, practical, not in elements. It's not a blockburger test. But can you point us to a case where we have looked at affidavits trying to estimate the factual likelihood that the conduct would be charged, in fact, as an exercise of prosecutorial discretion in this country? There is not such a case that I've been able to find. There's good reason, right? Because it's only in common law countries, basically, that there is such a thing as prosecutorial discretion. Most civil law countries go with a mandatory prosecution standard, right? That is correct, Your Honor. So that if we were starting to compare prosecutorial discretion against non-prosecutorial discretion, we would be getting out of the treaty standard of punishable, right? Yes, but I would say that if we're applying a realistic approach to whether or not this crime would have caused it. Let's apply a realistic approach. I mean, one of the reasons why the government of Japan cares a lot about this is because he didn't damage any structure, but ancient, you know, historically important landmarks, right? Well, that's why Japan is concerned about it. The question is whether that would have constituted a... The question is not just, you know, if you pour oil on a post somewhere in Manhattan, will it be prosecuted? But, you know, in fact, if there was something equivalently important, maybe the exercise of prosecutorial discretion would be different. And if you want to get into this sort of practical question of prosecutorial discretion, right, you would have to think about these particular circumstances, wouldn't you? Well, I think you could consider those, but I think in New York itself, whether or not it was a structure of any spiritual or religious significance is not relevant to... Well, it's not relevant to whether it's punishable, but you're just saying we should consider whether as a practical matter it will be punished. And if you want to get into that, then you have to think about the factors that would go into that decision, right? That's correct, Your Honor. And so in Japan, it's not just any structure. It is a very historically important and symbolic ancient landmark. That's what the claim would be from the Japanese government. That's correct. What I would say is that if we're going to do a dual criminality analysis and we're looking at whether this would be considered to be a felony in the State of New York, I would submit that, yes, hypothetically, it could be considered to be a felony. It's just that... Well, I think that just concedes your case. Well... No, I'm serious. I think you just conceded the government's case. The question is, is it punishable? If we reject your argument that we are supposed to figure out whether, in fact, it would have been charged, if we reject that argument, I think you've just conceded the government's case. I don't believe I conceded the government's case. Why not? What I've suggested is that the Court should go to a more broad-based, practical approach in... Yeah, my assumption is reject that. Assuming we do not ask your first-line question, assuming we do not ask whether it would have been charged, and we only ask could it have been charged, I'm saying that I think I heard you concede the government's case. Is that true? Or is it not? It's not true in a sense that... Then tell me why then it could not be charged. Not that it would not be charged, that it could not be charged. Explain why it could not be charged in New York. Could not. It could be charged, so I will say that. But it should... It's a practical matter... So you're saying it is punishable under the laws of both countries as the crime that satisfies the treaty requirement. It just likely would not or overwhelmingly likely would not be charged in New York. Is that the position you're taking with us today? It never would be charged in the State of New York, based upon what we have... It never would be charged, but it could be charged. Is that the position you're taking today? Yes, Your Honor. Okay. And I would ask the Court also to consider the fact that we submitted extrinsic evidence that would indicate that the Court, the District Court, based its conclusions, based upon, first of all, unscientific decision that somehow, one, the vegetable oil could have gotten into... Well, this is the kind of thing that your client can introduce at trial in Japan, right? Well... You're saying he's innocent, but we're not supposed to be deciding is he in fact innocent. The question is, can he be held over for trial? It would be like if there were an arrest warrant for your client, right? A criminal complaint signed by a judge, he's arrested, and you would say, well, I have lots of evidence that says the government should lose at trial. We wouldn't say, oh, my gosh, the arrest warrant needs to be invalidated. Well, that's not what... And that's all this is. This is a question of, did Japan provide enough to satisfy its burden of having your client bound over for trial to Japan, where you can put in all the evidence you want? But my understanding is that an extradition hearing is not an adversary hearing, where both parties put in contesting evidence, and then the district court sorts out who's right. Well, there is case authority from this circuit and other circuits that extrinsic evidence can be admitted at the discretion of the... Well, no, either way, it's probable cause, right? So you're saying that it is impossible for the oil to be absorbed by the wood and cause some kind of damage? That's correct. That's just completely impossible? Yes, that's correct. And how do we know that? From the testimony provided in an affidavit by Dr. DeFrancisco in the lower court. But isn't that exactly the kind of evidence that creates a credibility conflict between one expert and another expert? In other words, that is a challenge to the accuracy of the evidence that is submitted by the requesting State. I would say, based upon the terms of Dr. DeFrancisco's analysis, that this is a scientific fact. So, and I would submit... Well, that's one person's opinion of what's a scientific fact, right? I mean, it is literally expert opinion testimony under the rules of evidence. Presumably, if we were going to go down that road of considering that kind of evidence, then the government of the United States or the government of Japan could produce additional expert testimony. And then the magistrate judge or the judge sitting as the expedition court would have to decide who's right. And that's exactly the kind of thing that we don't do in expedition cases, that we don't do in magistrate judge's court when someone has been arrested in the United States. And the challenge is probable cause. We don't normally have a contest at that point as to whether the guy is really guilty because expert testimony would exonerate him. Well, as this Court has recognized in other situations, there is the discretion of the district court to entertain extrinsic evidence that clarifies the issue. And I myself participated in an extradition case in, not within this circuit, within the NICE circuit about 25 years ago, in which case the district court wanted extrinsic evidence to clarify what the actual facts would be. And that case also involved the government of Japan as well. Well, I think we have your argument. Why don't we hear it from the government? And actually, my first question for the government is, why is this case taking so long? Japan submitted their diplomatic note in 2016? That's right, Your Honor. How on earth? You've got me, Judge. I wish that I knew the answer to that. I know that the government has been patient with what's been going on at the district court level so far. My understanding is that Japan has asked repeatedly. That is, they haven't forgotten about the case, but they have also not pushed it too hard when they've been told. Well, their request is in. I mean, their request is in. They can't make us do anything. I guess I should have printed out the district court docket from the original proceeding, but I understand that the complaint was filed by the government in May of 2017, which is within a few months of getting the request from Japan. But there was no hearing until December of 2022? What was going on between May of 2017 and December of 2022? Honestly, Your Honor, I don't know. I'd obviously be happy to get back to the court if you want. No, that's fine. We can find it ourselves. No, that's fine. I apologize. Let me just ask you this. You heard what opposing counsel said. He conceded that if we conclude that the question is not whether the defendant here would have been punished or would be punished under American law, if the question is whether he is simply hypothetically punishable, that he conceded he would be punishable under New York law. In light of that concession, what else do you have to add for us? I have very little to add in light of that concession. I will just say one very brief remark because Mr. Dudley, at the end, spoke a little bit about the scientific affidavit, and I think that this court... Not about the scientific thing in a second, but just on this question about punishable. Sure. I mean, what are the limits of that principle? Like, if there is a statute, and you might say, well, under the plain terms, like, I guess you could prosecute somebody for this, but it's never been done because everybody really understands that the statute applies to this other kind of circumstance. That should have no bearing on whether we think it's a crime in the United States? Well, I think that, and this is undermined by the confession that he would hypothetically be punishable by this, and by the language in this Court's opinions over and over, where I'll just start with, and I will absolutely hit that, but I'll start with, where the fundamental crux is, and this is from just four months ago in Gomez, dual criminality is a requirement contained within many extradition treaties that the offense for which the fugitive is being extradited must be punishable under both countries' criminal law, and that's at page 56 of Gomez, and then later, it is enough if the particular act charged is criminal in both jurisdictions. So the question is whether it is criminal. And I think that your question gets to what I would call the Yates problem, which is the Yates problem. That is, Yates v. United States in the Supreme Court, where there was a question of whether or not. That conduct really was prescribed by the statute. Exactly. So I think that if you had a Yates argument, you might be able to go to the judge and say, even though we can stretch the language of the statute in such a way to cover this, we think. It's not punishable. Exactly, and it's a normal statutory interpretation argument, but that's not what we have here. What we have here is instead the claim that prosecutorial discretion would likely not, or we've just been told, would never allow for a felony prosecution of this. So you're saying that if extraditee makes the argument that, well, yes, this is criminalized, but come on, nobody really cares about it and they're never going to prosecute it, then that's not acceptable. That's right. But if they say nobody understands the language of the statute to cover this conduct, so it's not really criminal, then that would be something we'd have to resolve. That's right. And I think that the easy way to think about it would be what would be available to a criminal defendant if he were charged here. If somebody went and scratched John 316 into the wall at Temple Emanuel and was charged with criminal mischief in the third degree and then said, you know something, I've looked through the cases and I even have an ADA who says nobody's ever been charged with a felony for mere scratching of a word or a Bible verse into a wall, that would not be a basis to get the complaint dismissed. If, on the other hand, somebody were charged in Japan with throwing fish overboard and they came here and they said, you know, under Sarbanes-Oxley, that is a thing that is tossed overboard, then you could go in and say, you know, this is where we get to statutory interpretation. And just like the defendant in Yates was able to say the indictment here should be dismissed because a fish is not a thing for the purpose of Sarbanes-Oxley, so too with the extraditee. It's a legal object, but yes. I'm sorry, object. Thank you. I apologize. Okay. So then on the vegetable oil thing, so if it really were true that, you know, there was evidence that vegetable oil could never damage a wood structure, wouldn't that obliterate probable cause? It wouldn't, and there are a couple of reasons. And I first want to just note, it's a little interesting that we keep on talking about vegetable oil. There's actually no evidence in the record that it's vegetable oil. The only thing that — That's a useful point, but whatever. Like, so I guess that's an outstanding fact question, but, like, let's assume whatever this oil is, if there were some evidence that it could never cause damage to a wood structure, would that obliterate probable cause? No. And the reason is because you have very specific evidence here that there was, in fact, damage. There were affidavits or declarations by the managers of both the temple and the shrine, as well as the high priest at the shrine, saying that they observed the damage. Two years later at the temple, he said, it's still clear. At the shrine, they said, it's now much more difficult to see. You can only see it when the light hits it in a certain way, but it's still there. They submitted evidence by the repair companies that said, we found the damage. They're saying that they can't contradict the facts that are put forward, the evidence put forward by the Japanese authorities. They can't contradict it. Maybe they have a killer case at trial in Japan, but you can't contradict it now. That's right. I think that when you look at the discussion of obliterating evidence, and there are a couple cases that say there's never really been a clear-cut definition of them. But I think that, again, what seems to come out is, quote, obliterating evidence, which is usually referred to instead as explanatory evidence. It's adding something that doesn't actually contradict but simply clarifies what's going on. So one example might be, for example, if Italy sought to extradite somebody saying, we think he killed somebody by throwing him onto the tracks. And our evidence is that Joe was at one end of the railroad station. He saw the victim and Jane at the other end of the railroad station. And he saw them both standing by the track. The train came. He looked. He looked back. And now Jane was, the victim was on the ground and Jane was standing over it. And a reasonable inference there is, in the time that I looked away, Jane pushed the victim onto the tracks. Presumably, an explanatory evidence could be, oh, here is a video camera that shows that during the time that you were looking away, Jane tripped and fell, or the victim tripped and fell on his own. That would obliterate probable cause. That would obliterate probable cause. And it's explanatory. It's not contradicting anything because it's not saying he was wrong. It's saying, as there is with all evidence, there are always going to be gaps. Is there something that explains that gap in a way that fundamentally undermines probable cause? And when I asked about whether it would be impossible to damage the thing, you said, well, there's evidence that, like, there's still a visible mark externally. But, like, let's say that this case dragged out even longer and eventually it was not visible externally. Would the claim by Japan that, well, it could be, and the district court, by the way, that it could be absorbed into the wood, would that be enough to establish probable cause? Would he say, well, it's impossible for that to happen? I don't think so. I mean, I think that state courts have said, look, chalk may be an exception to this because that is just so fundamentally febrile. But there is no rule that, for example, had he been extradited quickly rather than had it taken 10 years to do all of this, there's no idea that, oh, well, we have to wait and see because let's say this were happening right now in 2016 when everybody agrees you could see something and there was still damage. There would be no claim, well, we don't get to extradite him for 20 years because we have to see if the damage remains 20 years later. This fundamentally damaged— Well, the response might be, well, if we have evidence that there's an external mark but it will fade over time and not lead to any damage, maybe it wouldn't violate the statute. Well, again, we also have the declarations from the people who run both the temple and the shrine explaining how this genuinely damaged it, explaining the importance of the sanctity of these structures, explaining in detail why this is extremely important to their religion and to the visitors to see this as it is, why the idea of fixing it, one of the reasons— So the damage is in the first 20 years while it's visible, that's damage. That's right. I don't know what— Even if we expect that it will fade, it still would be punishable. I think that's absolutely right because there's—I've seen absolutely nothing that says otherwise and it would be almost silly to say otherwise because given sufficient time, almost all damage ends up wearing away over time. I mean, if you were—if I were to carve something in this wood, 500 years from now, that wood will have sufficiently deteriorated that you wouldn't see the carving. This is specifically true about these Japanese structures. They are made of wood and they are very old. And in fact, none of those beams are the same beams that were there when it was made. These things have been restored and remade many times. So there will come a day when that pillar will be replaced for other reasons, whether or not it's been damaged. That's right. I mean, that's a bit of a Theseus' ship idea to this. But I think that beyond that, you also have the fact that I believe it was from the shrine. The general manager said there's another problem with repairing this, which is one thing that we don't like to do is show that problem of replacement. And if we replace this, we'll actually have to replace a whole lot of other things because now the wood won't match because you have the millennium old wood next to wood that you took from the forest three weeks ago. And there's just a fundamental difference between those. Okay. We have your argument. Why don't we hear from Mr. Dudley? You have reserved three minutes. Thank you, Your Honor. What I think needs to be said here is that the court should consider whether or not the district court ought to have allowed the admission of the extrinsic evidence that we presented here, that was presented in the district court. First of all, I want to emphasize, I think the government submitted that, that no repairs were actually conducted on the structures in Japan, either the Katori Shrine or the Narita Temple. Why does that matter? I mean, if you damage my house and I don't fix it, I'm still thinking about fixing it. Because according to Dr. Jeff- Or I've got a big scratch on my car. I mean, somebody hits my bumper and I take the insurance money and I'm like, well, you know what, I'm going to live with a scratch. It doesn't mean my car wasn't scratched. So I'm trying to understand why that would be relevant at all, even assuming it should be. There could not have been damage to either the lacquered wood structure or the rock. That's one argument.  It's not that if you don't repair it, it's not a damage. Yeah. That's the argument, and that's why the court should have considered the expert testimony that we presented, that this was a scientific- You're saying that we should have drawn the inference from the fact that the Japanese government or whoever, the shrine owners, didn't fix it, that there must not have been anything to fix, notwithstanding the fact that they got bills showing how much it would cost to fix? No, Your Honor. I'm not saying that. I'm saying that the damage alleged could not have occurred as a matter of scientific fact. That's what I'm- Okay. All right. And the court should have- What else do you have on rebuttal? We've heard that argument. What else? I would submit that the arguments, the testimony of Mr. Bosco, former prosecutor, concerning whether this would ever have been prosecuted- Right. And that goes to whether it would have been prosecuted, not whether it's prosecutable. Okay. And the question also of the repair costs, the fact that no repairs were made, there was no repair cost, and it would be under New York law that you'd have to prove the amounts necessary under felony criminal mischief two or felony criminal mischief three, and that because there's no repairs at all that would have met that standard. Okay. Anything further? Nothing further, Your Honor. Okay. Thank you very much to both sides for coming in today. We will take the case under advisement.